IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

OCT - 3 2013

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                DEPUTY CLERK

| | |
|---|---|
| QIANG WEI, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § |
| | § |
| SOUTHWEST RESEARCH INSTITUTE, | § |
| | § |
| Defendant. | § |

CASE NO. 5:12-CV-00872-FB

## DEFENDANT SOUTHWEST RESEARCH INSTITUTE'S
## MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendant Southwest Research Institute ("SwRI"), and files this its

Motion for Summary Judgment, and in support of same respectfully shows as follows:

### I.
### INTRODUCTION

Plaintiff Qiang Wei ("Plaintiff" or "Wei") has filed this lawsuit against his former

employer SwRI alleging that SwRI discriminated against him on the basis of his race and

national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

§ 2000e et seq. ("Title VII") and the Texas Commission on Human Rights Act, Texas Labor

Code § 21.001 et seq. ("TCHRA"), and his race in violation of 42 U.S.C. § 1981 ("§ 1981").

Wei also claims that he was retaliated against by SwRI in violation of Title VII, § 1981, and the

TCHRA. SwRI is entitled to summary judgment with respect to all of Plaintiff's claims because

there are no genuine issues of material fact. Specifically, with respect to his discrimination

claims, Wei cannot establish a prima facie case because he cannot show that SwRI maintained an

"English-only" policy or that any similarly situated individuals were treated more favorably.

Likewise, with respect to his claim of retaliation, Wei cannot establish that he engaged in

protected activity or that there was a causal connection between his alleged protected activity and

his termination.   Finally, assuming arguendo that he could establish a prima facie case of discrimination or retaliation, Wei cannot establish that SwRI's legitimate reason for terminating his employment is a pretext.   Accordingly, SwRI is entitled to summary judgment as a matter of law and Wei's claims should be dismissed in their entirety.

## II.
## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, the record reflects that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); FED. R. CIV. P. 56(c).   Summary judgment is warranted if a plaintiff fails to make a showing sufficient to establish the existence of an element essential to his case. *See Celotex*, 477 U.S. at 322.   "If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 621 (5th Cir. 2000) (internal quotations and citation omitted).

Unsubstantiated beliefs and opinions, however, are not competent summary judgment evidence. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).   "[M]ere conclusory allegations" are also "insufficient to defeat . . . a motion for summary judgment." *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992); *see also* FED. R. CIV. P. 56(e).   In other words, a nonvovant must do more than show "some metaphysical doubt as to the material facts" to defeat a motion for summary judgment. *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).   Rather, he must produce evidence upon which a jury reasonably could base a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).   Particularly, the nonmovant must produce, through competent evidence, ***specific facts*** showing that there

remains a genuine issue for trial. *Matsushita Elec.*, 475 U.S. at 586-87; *Garcia v. Elf Atochem North America*, 28 F.3d 446, 447 (5th Cir. 1994). If Plaintiff fails in his burden, then summary judgment is mandated.

## III.
## BACKGROUND FACTS

**A.** **Wei's Initial Employment**

SwRI is one of the oldest and largest independent, nonprofit, applied research and development organizations in the United States. SwRI's eleven (11) technical divisions offer a wide range of technical expertise and services in such areas as chemistry, space science, nondestructive evaluation, automation, engine design, mechanical engineering, and electronics. SwRI's Engine, Emissions and Vehicle Research Division ("Division 03") conducts design, development, and test programs on a wide range of components, engines, transmissions, and vehicles. Bruce Bykowski serves as the Vice President of Division 03. Exhibit A, Deposition of Bruce Bykowski, p. 5. Located in Division 03 is the Emissions R&D Department (the "Department"). The Department performs particle science research and development on spark-ignited and compression ignition engines that are used in passenger cars, trucks and buses, and non-road engines used in agricultural and construction equipment. Jeff White serves as the Department's Director. Exhibit B, Deposition of Jeff White, p. 5. Dr. Imad Khalek was a Program Manager in the Department at the time of Wei's employment.[1] Exhibit C, Deposition of Imad Abdul-Khalek, p. 6.

Wei received a Ph.D. in mechanical engineering in 2002 from the University of Minnesota.[2] Exhibit D, Deposition of Qiang Wei, p. 34. While at the University of Minnesota,

---

[1] Khalek is a native of Lebanon and speaks Arabic, French, and English. Exhibit C, Deposition of Imad Abdul-Khalek, pp. 23, 33.

[2] Wei is a Chinese national. Exhibit D, Deposition of Qiang Wei, p. 96.

Wei's faculty advisor was Dr. David Kittelson, a leading expert in particle science.[3]  Exhibit D, Deposition of Qiang Wei, p. 34.  Both Wei and Khalek studied under Professor Kittelson and their studies at the University overlapped somewhat.[4]  Exhibit D, Deposition of Qiang Wei, p. 75; Exhibit C, Deposition of Imad Abdul-Khalek, pp. 8-10.  Based on his familiarity with Wei from the University and his knowledge of the projects on which Wei was working, Khalek recruited Wei to apply at SwRI.  Exhibit C, Deposition of Imad Abdul-Khalek, pp. 13-14.

As part of the application process at SwRI, job candidates for high level positions such as Principal Engineer are required to make a short presentation before a panel of evaluators. Exhibit C, Deposition of Imad Abdul-Khalek, p. 15.  Wei's panel was comprised of Khalek, White, and Bykowski along with Erin Rogers (Human Resources representative), Christopher Sharp (Staff Engineer), Martin Heimrich (Principal Engineer), and Vlad Ulmet (Assistant Director of the Department).  In her comments on Wei's interview, Rogers noted that Wei's accent "can frequently be difficult to understand" and that she was concerned that the "difficulty in understanding [Wei] is cause for concern since this is something that could create communication issues with clients."  Exhibit E, Rogers' Interview Notes.  In spite of this concern, Rogers recommended Wei's hiring.  Exhibit E, Rogers Interview Notes.  Likewise, Heimrich noted that Wei's communications skills were "average" and recommended his hiring as well.  Exhibit F, Heimrich Interview Notes.  Bykowski also "recommended" that Wei be hired, while White and Sharp "highly recommended" Wei's hiring.   Exhibit G, Bykowski Interview Notes; Exhibit H, White Interview Notes; Exhibit I, Sharp Interview Notes.[5]

---

[3] Wei also considers Khalek a leading expert in particle science.  Exhibit D, Deposition of Qiang Wei, p. 76.

[4] Khalek has a Bachelor's degree in aerospace engineering, a Master's degree in mechanical engineering, and a Ph.D. in mechanical engineering, all from the University of Minnesota.  Exhibit C, Deposition of Imad Abdul-Khalek, p. 8.

[5] Ulmet was "undecided" as to Wei's hiring.  Exhibit K, Ulmet Interview notes.

Khalek, for his part, rated Wei as average in communications and noted that prior to recommending Wei for an interview, Khalek was "aware that [Wei's] verbal communication skills, and to a certain degree, his writing skills may not be so great." Exhibit J, Khalek Interview Notes.  Khalek also noted that Wei would need supervision and training in his communication skills.  However, Khalek felt that Wei's "technical knowledge and ability to do things outweigh[ed] any communication deficiencies." Exhibit J, Khalek Interview Notes. Ultimately, Khalek "highly recommended" that Wei be hired.  Exhibit C, Deposition of Imad Abdul-Khalek, p. 23; Exhibit J, Khalek Interview Notes.

Wei was hired by SwRI on November 8, 2010 as a Principal Engineer in Division 03. Exhibit D, Deposition of Qiang Wei, pp. 15-16, 96.  The Department was looking for opportunities to expand its work in China, and Bykowski and White noted that one of the reasons Wei was added to the Department was for this purpose.  Exhibit A, Deposition of Bruce Bykowski, pp. 15-16, 71-72; Exhibit B, Deposition of Jeff White, p. 37.  As such, Wei's Chinese background and language skills were "very important." Exhibit B, Deposition of Jeff White, p. 37.  Khalek served as Wei's immediate supervisor at SwRI.  Exhibit D, Deposition of Qiang Wei, p. 74.  While there were other Principal Engineers in the same Division, Wei was the only Principal Engineer serving under Khalek.  Exhibit D, Deposition of Qiang Wei, p. 122.

**B.      Wei's Initial Evaluation**

Approximately six months after he was hired, on June 13, 2011, Wei was given a "Meets Expectation" initial performance evaluation.  Exhibit L, June 2011 Performance Evaluation Summary.  This initial performance evaluation provided specific areas in which Wei was asked to improve his job performance.  Specifically, Wei was "encouraged to sharpen his skills in effective communications by engaging more laboratory staff and clients" and "to improve his

writing and proposal writing skills by taking appropriate classes." Exhibit L, June 2011 Performance Evaluation Summary. His future performance goals and expectations included: "seek[ing] and lead[ing] new emissions research projects from the China market," "engag[ing] in ongoing projects and future projects led by the Section," and "submit[ting] an IR project related to the development of a new particle instrument." Exhibit L, June 2011 Performance Evaluation Summary. It was also recommended that Wei "take an English writing class to sharpen his writing skills." Exhibit L, June 2011 Performance Evaluation Summary.

## C.    Wei's Job Performance Following His Initial Evaluation

On or about June 24, 2011, Khalek gave Wei an assignment to write an Internal Research Proposal for an instrument that measures carbon in engine exhaust. Exhibit D, Deposition of Qiang Wei, p. 180; Exhibit M, Internal Research Proposal. As background, SwRI budgets a certain amount of funds for staff-proposed projects that are designed to advance knowledge in a particular technology area. Exhibit B, Deposition of Jeff White, p. 39. SwRI has a formal process for vetting internal proposals consisting of a review by a department director, another engineer, the head of the Division, and the Advisory Committee for Research. Exhibit B, Deposition of Jeff White, pp. 39-41. Wei turned in his Proposal to Khalek on July 18, 2011, as requested. Exhibit D, Deposition of Qiang Wei, pp. 182-83. After reviewing and suggesting a few edits, Khalek gave the proposal to White for further review. Exhibit C, Deposition of Imad Abdul-Khalek, pp. 148-49, 153   The proposal required a number of edits by White both in grammar and in construction and architecture of the document.   Exhibit B, Deposition of Jeff White, pp. 63-64; Exhibit M, Internal Research Proposal.

In addition, Wei was not making progress on two projects given to him by Khalek – a Real Time Ash Instrument Project and an EPA project. Exhibit C, Deposition of Imad Abdul-

Khalek, pp. 29-32, 37.  In the Real Time Ash project, Wei was focused on a "downstream" diluter of the ash measurement system instead of focusing on the ash measurement at the heart of the project.  Exhibit C, Deposition of Imad Abdul-Khalek, pp. 29-30.  Khalek instructed Wei several times to focus on the ash measurement and to make progress on that aspect of the project. Exhibit C, Deposition of Imad Abdul-Khalek, p. 30.  Regarding the EPA project, Khalek instructed Wei to establish a target efficiency of 99 percent.  Exhibit C, Deposition of Imad Abdul-Khalek, p. 31.  Wei disagreed with that target and stated that they could not achieve more than a 65 percent efficiency and that they should use a different coating on the materials for the project.  Exhibit C, Deposition of Imad Abdul-Khalek, p. 31.  Khalek did not agree and instructed Wei to focus on meeting the 99 percent efficiency target and to use the materials given.  Exhibit C, Deposition of Imad Abdul-Khalek, p. 32.[6]

D.      **Wei's Annual Evaluation**

On August 4, 2011, Wei was given a rating of "Needs Improvement" on his first annual performance evaluation.  Exhibit N, August 2011 Performance Evaluation Summary.  In addition to the previous concerns that management indicated in his initial performance evaluation regarding Wei's communication deficiencies, Khalek and White reminded Wei that he "is expected to be a hands-on engineer, making progress in the laboratory," that "he can depend on some assistance from other staff members, [but] cannot wait if others are not making progress," and that he "is responsible for meeting project objectives in a timely manner, before pursuing any other interest."  Exhibit N, August 2011 Performance Evaluation Summary.  Because of his performance deficiencies, Wei was instructed to submit weekly written progress reports to Khalek of the work completed.  Exhibit N, August 2011 Performance Evaluation Summary.

---

[6] Following Wei's termination, Khalek was able to meet the 99 percent efficiency target using the given materials. Exhibit C, Deposition of Imad Abdul-Khalek, p. 32.

Additionally, Khalek reminded Wei to "follow the rules of the workplace and clearly communicate any issues to his immediate supervisor." Exhibit N, August 2011 Performance Evaluation Summary. Further, in light of the heavy editing required for his IR proposal, Wei was told that his written communications must be "thoroughly reviewed by the supervisor for technical content, grammar, organization, etc." Exhibit N, August 2011 Performance Evaluation Summary.

In an effort to help him improve Wei's communication skills, Khalek also conveyed his expectation that Wei was to speak English in the workplace when other non-Chinese speaking co-workers were present. Exhibit N, August 2011 Performance Evaluation Summary; Exhibit C, Deposition of Imad Abdul-Khalek, pp. 47-48. Wei was not informed that he could never speak Chinese at SwRI, but he was requested to do so in a place and time that would not diminish his opportunity for development. Exhibit C, Deposition of Imad Abdul-Khalek, pp. 76-77. Moreover, as Wei admitted and others confirmed, SwRI does not maintain an "English-only" policy. Exhibit D, Deposition of Qiang Wei, pp. 102-03; Exhibit B, Deposition of Jeff White, p. 27; Exhibit O, Deposition of Bill Crumlett, pp. 46-47; Exhibit A, Deposition of Bruce Bykowski, p. 64; Exhibit P, Deposition of Anthony Magaro, p. 16.

After receiving but before signing his annual evaluation, Wei reached out to Erin Angell, a Specialist in SwRI's Human Resources Department, asking her whether he needed to sign the evaluation if he disagreed with it. Exhibit Q, Email from Angell dated August 4, 2011. Angell informed Wei that his signature simply reflected receipt of the evaluation, not agreement, and that he was free to rebut the evaluation by including his own comments. Exhibit Q, Email from Angell dated August 4, 2011. Wei also complained to Angell that Khalek had high expectations for him and that SwRI should use similar standards to judge an employee's performance.

Exhibit Q, Email from Angell dated August 4, 2011.  In response, Angell noted that each Division has some discretion within SwRI's guidelines regarding the performance evaluation process, and she encouraged Wei to meet with his supervisor to seek further clarification of his supervisor's expectations.  Exhibit Q, Email from Angell dated August 4, 2011.  Most telling is the fact that Wei did not mention anything to Angell about Khalek's directive to speak English when others were present in the workplace; nor did he complain that any such directive was discriminatory in any way.  Exhibit D, Deposition of Qiang Wei, p. 227; Exhibit Q, Email from Angell dated August 4, 2011.  In fact, they exchanged a total of 5 emails that day and never once did he mention, much less complain, about Khalek's directive.

In his written comments regarding the evaluation that were completed several days later, Wei noted that he "like[d] the job in the particle lab."  Exhibit N, August 2011 Performance Evaluation Summary.  Further, Wei noted that he believed Khalek had "more strict standards than normal people" and that Khalek had "high expectations" for him.  Exhibit N, August 2011 Performance Evaluation Summary.  Wei also noted that he had difficulty following Khalek's "vague instructions."  Exhibit N, August 2011 Performance Evaluation Summary.  Despite these criticisms about Khalek, nowhere in his comments did Wei mention Khalek's directive to speak English when others were present in the workplace much less state that he believed that directive to be discriminatory.  Exhibit D, Deposition of Qiang Wei, pp. 222, 225; Exhibit N, August 2011 Performance Evaluation Summary.  Instead, the only aspect of his employment that Wei noted as unfair was the fact that Khalek had higher standards than other supervisors at SwRI.  Exhibit D, Deposition of Qiang Wei, p. 225; Exhibit N, August 2011 Performance Evaluation Summary.

In addition to emailing Angell, Wei went to White's office on August 4, 2011, to discuss his evaluation, and White scheduled a meeting between the three of them the following day. Exhibit D, Deposition of Qiang Wei, p. 241; Exhibit B, Deposition of Jeff White, pp. 31, 50-51.

**E.      The August 5, 2011 Meeting**

On August 5, 2011, Wei met with Khalek and White to discuss Wei's evaluation.  Wei brought a hand-held recording device to this meeting and recorded the conversation, without informing White or Khalek that he was doing so.[7]  Exhibit D, Deposition of Qiang Wei, pp. 210-11, 241.  During this meeting, Wei expressed his concern that the performance evaluation was unfair in certain respects.  Exhibit B, Deposition of Jeff White, p. 51.  Before leaving the meeting, White concluded that Wei was not providing his best efforts in his position and that the performance evaluation properly assessed his level of performance.  Exhibit B, Deposition of Jeff White, p. 51.  The meeting resulted in White concluding that Wei was being treated fairly, and White encouraged Wei to communicate and cooperate with Khalek going forward. Exhibit B, Deposition of Jeff White, pp. 51-52.

After White left the meeting, Wei raised the issue of not being able to speak Chinese in the workplace when others were present.  Exhibit D, Deposition of Qiang Wei, p. 262.  However, Wei never complained that the Chinese language directive that he received the day before was discriminatory; nor did he ever raise such a complaint with White.  Exhibit C, Deposition of Imad Abdul-Khalek, p. 89; Exhibit R, Deposition of Jeff White (2), pp. 7-8, 54.  Moreover, White testified that Chinese is spoken by several individuals throughout the Department on a daily basis, that the Institute was relying on Wei's Chinese language skills to obtain new business from China, and that Wei's use of the Chinese language played no role in his eventual

---

[7] After listening to the recording of the August 5, 2011 meeting, Wei realized that the recording quality was so bad that he decided to purchase a new recording device to use at subsequent meetings.  Exhibit D, Deposition of Qiang Wei, p. 270.

termination.  Exhibit B, Deposition of Jeff White, p. 37; Exhibit R, Deposition of Jeff White (2), pp. 52-53.

**F.      Events Leading to Termination Recommendation**

Following the August 5, 2011 meeting and contrary to White's request that Wei improve his communications with Khalek, Wei began to only communicate with Khalek in e-mails. Exhibit S, Email from Khalek dated August 11, 2011.  Worse yet, Wei began requesting step-by-step instructions for his work, which was unacceptable for an employee of Wei's experience and professional position.  Exhibit B, Deposition of Jeff White, p. 71; Exhibit O, Deposition of Bill Crumlett, pp. 70-71, 73; Exhibit C, Deposition of Imad Abdul-Khalek, pp. 119-121, 131-32; Exhibit A, Deposition of Bruce Bykowski, pp. 79-80.  Wei also contributed to breaking parts on two laboratory instruments, rendering the instruments inoperable for a period of time.  Exhibit R, Deposition of Jeff White (2), p. 8; Exhibit C, Deposition of Imad Abdul-Khalek, pp. 57-58. Most critically, Wei's performance following his evaluation deteriorated significantly. Exhibit C, Deposition of Imad Abdul-Khalek, p. 54.  Thus, instead of working to improve his performance, Wei exhibited a complete lack of performance and lack of responsiveness. Exhibit C, Deposition of Imad Abdul-Khalek, p. 55.

As an example, on August 8, 2011, Wei sent Khalek an email in which he claimed to be attempting to "summarize" the workplace rules referenced in Wei's annual evaluation. Exhibit T, Email from Wei dated August 12, 2011.  Included in this summary was an alleged directive from Khalek stating that "English is the only language that can be used on the SwRI's campus" and that "[o]ther language aren't allowed even though the employee's office door is closed."  Exhibit T, Email from Wei dated August 12, 2011.  This alleged "summary" regarding Khalek's directive was an intentional misstatement as Wei's annual evaluation stated otherwise.

Exhibit N, August 2011 Performance Evaluation Summary. In fact, Khalek responded by stating that what he had requested of Wei was "already listed in [his] performance review sheet" and that some of the "rules" summarized by Wei were of his "own making and interpretation." Exhibit T, Email from Wei dated August 12, 2011.

After discussing Wei's deteriorating performance with White and providing White with email evidence of Wei's uncooperative behavior and refusal to perform the tasks assigned to him, on August 12, 2011, Khalek recommended to White and Bykowski that Wei's employment be terminated. Exhibit S, Email from Khalek dated August 11, 2011; Exhibit U, Khalek Termination Recommendation; Exhibit C, Deposition of Imad Abdul-Khalek, p. 51. In his termination recommendation, Khalek noted that Wei's "poor verbal communications skills have held him back in engaging with other technical and professional staff members." Exhibit U, Khalek Termination Recommendation. Khalek also noted that Wei received the lowest score in oral presentations at a recent conference. Exhibit U, Khalek Termination Recommendation. In addition, Khalek pointed to the IR proposal as an example of Wei's poor written communication skills. Exhibit U, Khalek Termination Recommendation. Moreover, Khalek noted that Wei's performance had gone "downhill" since receiving the NI rating on his evaluation. Exhibit C, Deposition of Imad Abdul-Khalek, p. 113; Exhibit U, Khalek Termination Recommendation. Instead of seeking to improve his performance, Khalek noted that Wei was now seeking daily work instructions and debating with Khalek over work assignments. Exhibit U, Khalek Termination Recommendation. In the course of his work, Wei also damaged two particle instruments. Exhibit U, Khalek Termination Recommendation. As a result of his unacceptable performance, Khalek was forced to remove Wei from his assignment. Exhibit U, Khalek Termination Recommendation. Critically, Khalek never mentioned Wei's speaking of Chinese

on the SwRI campus as a reason for Wei's termination.   Exhibit U, Khalek Termination Recommendation.  To the contrary, Khalek believed that whether Wei spoke Chinese at SwRI or not was irrelevant to Wei's lack of performance.  Exhibit C, Deposition of Imad Abdul-Khalek, pp. 96; 101.

White agreed with this recommendation and testified at his deposition that despite the short time between his annual evaluation and the recommendation for termination, it was Wei's choice to be uncooperative and that Wei's attitude and relationship with Khalek soured considerably in this short period of time.  Exhibit B, Deposition of Jeff White, p. 74.  After reviewing alternative positions for Wei at SwRI and finding none available, Bykowski accepted the recommendation for termination on August 16, 2011.  Exhibit R, Deposition of Jeff White (2), pp. 43-44; Exhibit A, Deposition of Bruce Bykowski, pp. 11-13, 19-20.

In the meantime, the communication and interpersonal problems between Wei and Khalek continued as evidenced by an August 18, 2011 e-mail that Wei sent to White, Bykowski, Bruce Crumlett (Executive Director of Human Resources), and several Human Resources staff members titled, "Is this a health work environment?"  Exhibit V, Email from Wei dated August 18, 2011.  Incredibly, Wei attached the same e-mail communications that Khalek had provided to White as evidence of Wei's uncooperative and obstinate behavior.  Exhibit D, Deposition of Qiang Wei, pp. 250-51; Exhibit V, Email from Wei dated August 18, 2011; Exhibit S, Email from Khalek dated August 11, 2011.  And just as telling, Wei's email made no reference to Khalek's directive regarding speaking Chinese.  Exhibit D, Deposition of Qiang Wei, p. 251; Exhibit O, Deposition of Bill Crumlett, p. 81; Exhibit V, Email from Wei dated August 18, 2011.  After reviewing the e-mail received from Wei, SwRI's HR Department

concluded that Wei had not raised a reasonably-founded complaint of harassment. Exhibit O, Deposition of Bill Crumlett, p. 70.

On August 19, 2011, White provided a supplement to Wei's termination recommendation to Bykowski. Exhibit W, White Termination Recommendation. White noted that instead of redoubling his efforts to address the deficiencies identified in the evaluation, Wei "chose to be argumentative with [Khalek] regarding the details of his assignments" and that Wei would "complete one small task and then request instructions as to what to do next." Exhibit W, White Termination Recommendation. In White's view, this type of behavior from an experienced Ph.D. was "completely inappropriate." Exhibit B, Deposition of Jeff White, p. 71; Exhibit W, White Termination Recommendation. Further, White clarified that Khalek's directive regarding speaking Chinese was made "in reference to rudeness" and that White understood that Khalek, being a speaker of multiple languages himself, found it "rude to hold a private conversation in another language in the presence of others not speaking that language." Exhibit W, White Termination Recommendation; Exhibit B, Deposition of Jeff White, pp. 26-29, 90-91; Exhibit C, Deposition of Imad Abdul-Khalek, p. 23. Khalek did not have anything to do with the drafting of this supplemental recommendation. Exhibit C, Deposition of Imad Abdul-Khalek, pp. 97, 101.

## G.   PARC Committee and Termination

Under SwRI's policies and procedures, once a termination recommendation is forwarded to HR by the head of a Division, a personnel action review committee or PARC Committee is formed to review the recommendation. Exhibit X, Termination of Employment Policy; Exhibit R, Deposition of Jeff White (2), p. 55; Exhibit O, Deposition of Bill Crumlett, p. 9; Exhibit A, Deposition of Bruce Bykowski, pp. 70, 86. The PARC Committee considering Wei's

termination consisted of White, Bykowski, Jack Fernandi (Treasurer), Bill Crumlett (Executive Director of Human Resources), John McLeod (General Counsel), and Walter Downing (Executive Vice President).   Exhibit R, Deposition of Jeff White (2), p. 56; Exhibit O, Deposition of Bill Crumlett, pp. 74-75.   The committee was provided with the termination recommendation and documents supporting the recommendation, including the email exchange between Wei and Khalek and Wei's IR proposal with White's edits.   Exhibit R, Deposition of Jeff White (2), p. 55; Exhibit O, Deposition of Bill Crumlett, pp. 39, 49, 74.   The Committee approved Wei's termination on August 19, 2011.   Exhibit O, Deposition of Bill Crumlett, p. 77.

On August 22, 2011, Bykowski and White met with Wei to inform him of his termination based on his inability or unwillingness to perform the work for which he was hired.   Exhibit A, Deposition of Bruce Bykowski, pp. 16-17; Exhibit O, Deposition of Bill Crumlett, p. 79.   In addition, Bykowski provided Wei with a letter outlining the reasons for his termination. Exhibit A, Deposition of Bruce Bykowski, pp. 34-35; Exhibit Y, Termination Letter.   Wei also recorded this conversation, again without informing Bykowski and White that he was doing so. Exhibit D, Deposition of Qiang Wei, pp. 211, 272.   Wei's termination was effective on August 22, 2011.   Exhibit D, Deposition of Qiang Wei, p. 16; Exhibit Y, Termination Letter.

## IV.
## ARGUMENTS AND AUTHORITIES

**A.**   **Wei cannot establish a prima facie case of discrimination.**[8]

To establish a prima facie case of discrimination, Wei must show that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he was subject to an adverse employment action; and (4) he was replaced by someone outside of his protected class, or

---

[8] In the absence of direct evidence of discrimination, this Motion will analyze Wei's discrimination claims under the burden-shifting framework set out by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   *See Nasti*, 492 F.3d at 593.

similarly situated employees outside his protected class were treated more favorably. *See Pryor vs. MD Anderson Cancer Ctr.*, 495 F. App'x 544, 546 (5th Cir. 2012); *Reed vs. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012); *Nasti v. CIBA Specialty Chems.*, 492 F.3d 589, 593 (5th Cir. 2007).[9]  Only if Plaintiff is able to establish his prima facie case of discrimination does the burden of production shift to SwRI to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See Reed*, 701 F.3d at 439; *Nasti*, 492 F.3d at 593; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (holding that the employer bears only a burden of production, not persuasion, when tendering its nondiscriminatory reason).  Once SwRI articulates this legitimate reason, "the presumptions of discrimination dissipates, and [Wei] bears the ultimate burden of persuading the trier of fact that [SwRI] engaged in intentional discrimination." *See Nasti*, 492 F.3d at 593.  Wei must then establish either: (1) SwRI's legitimate reason is not true, but a mere pretext for discrimination (the traditional pretext approach); or (2) although SwRI's reason is true, it was only one reason for its conduct and Wei's protected characteristic was a motivating factor in the disputed employment decision (the mixed motive approach).[10]  *See Autry v. Fort Bend Indep. School Dist.*, 704 F.3d 344, 347 (5th Cir. 2013); *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).  Regardless, the

---

[9] Wei's Section 1981 claims are considered under standards similar to those of his Title VII claims. *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 650 (5th Cir. 2012) (recognizing that race discrimination and retaliation, and hostile work environment claims brought under § 1981, Title VII, and the TCHRA "are analyzed under the same standard").  However, section 1981 claims do not encompass discrimination based on national origin. *Alvarado v. Shipley Donut Flour & Supply Co., Inc.*, 526 F. Supp. 2d 746, 754 (S.D. Tex. 2007).  Wei's TCHRA claims are considered under the same Title VII standards. *See Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 633-34 (Tex. 2012).

[10] The mixed motives approach only applies if Wei  concedes that discrimination was not the sole reason for the alleged discriminatory conduct and instead argues that it was only a motivating factor. *See Richardson v. Monotronics Int'l, Inc.*, 434 F.3d 327, 333, 335 (5th Cir. 2005).  Should Wei pursue this alternative, his damages are limited to declaratory relief, certain types of injunctive relief, attorney's fees, and costs. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 94 (2003) (citing 42 U.S.C. § 2000e-5(g)(2)(B)).  To date, Wei has not argued mixed motive; consequently, this Motion examines only the pretext alternative.

burden of persuasion remains at all times with Wei. *See Reeves*, 530 U.S. at 153; *Rachid*, 376 F.3d at 312.

    **1.    Wei was not given an "English-only" directive.**

    As noted above, in an effort to help Wei improve his communication skills, Khalek wrote in Wei's annual evaluation that Wei was to speak English in the workplace when others were present and that he could excuse himself to another location when and if he needed to speak Chinese. Exhibit N, August 2011 Performance Evaluation Summary; Exhibit C, Deposition of Imad Abdul-Khalek, pp. 47-48. This is not an "English-only" directive as claimed by Wei. To the contrary, even Wei admitted that SwRI does not have an "English-only" policy. Exhibit D, Deposition of Qiang Wei, pp. 102-03. Furthermore, Wei's evaluation did not state that he could never speak Chinese on the SwRI campus, just that he should refrain from doing so while others were present. Exhibit N, August 2011 Performance Evaluation Summary.

    Even if it were viewed as an "English-only" policy, Khalek's directive to Wei does not run afoul of the EEOC's guidelines regarding these types of policies. The guidelines distinguish between policies requiring employees to speak English at all times or "only at certain times." *See* 29 C.F.R. § 1606.7. Regarding policies that require English at all times, the guidelines state: "Prohibiting employees at all times, in the workplace, from speaking their primary language or the language they speak most comfortably, disadvantages an individual's employment opportunities on the basis of national origin. [ ] Therefore, the Commission will presume that such a rule violates [T]itle VII and will closely scrutinize it." *Id.* § 1606.7(a). Conversely, policies that require English only at certain times are permitted where the employer can show the rule is "justified by business necessity." *Id.* § 1606.7(b); *see also Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170-71 (10th Cir. 2007) (upholding policy prohibiting employees from speaking

Spanish while on the job and during job-related discussions, but permitting Spanish conversations during breaks or during non-job related discussions).

Yet some courts have refused to give any level of deference to these guidelines, with at least one court noting that the guidelines contradict the text of the statute by shifting the burden of showing business necessity to the employer before the plaintiff has actually come forward with evidence of discrimination. *See, e.g.*, *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1489-90 (9th Cir. 1993) (considering the guidelines under a claim of discrimination based on disparate impact). Other courts, including the Fifth Circuit, have refused to apply these guidelines to bilingual employees. *See, e.g.*, *Garcia v. Gloor*, 618 F.2d 264, 272 (5th Cir. 1980) (holding that "an employer's rule forbidding a bilingual employee to speak anything but English in public areas while on the job is not discrimination based on national origin as applied to a person who is fully capable of speaking English and chooses not to do so in deliberate disregard of his employer's rule."); *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 613 (S.D.N.Y. 2009) ("Given the EEOC's position, it should not be surprising that Plaintiff has failed to identify a single case in which a court upheld a Title VII claim in the face of a summary judgment motion where the language policy involved work-related communications by bilingual employees and the policy was found to further a legitimate business purpose."); *Olivarez v. Centura Health Corp.*, 203 F. Supp. 2d 1218, 1125 (D. Colo. 2002) (finding that a plaintiff who was fluent in English failed to show how the employer's policy requiring English was a job detriment). Even courts that have adopted the rationale of these guidelines have done so where the policy requires English "at all times" and where there has been additional evidence of discrimination such as ethnic slurs and firing employees who did not agree to abide by the

policy. *See EEOC v. Premier Operator Services, Inc.*, 113 F. Supp. 2d 1066, 1073-76 (N.D. Tex. 2000).

Here, by contrast, there is no evidence that Khalek prohibited Wei from speaking Chinese altogether, that Wei was terminated because he refused to follow Khalek's directive, or that Wei was subjected to any type of ethnic slurs. Furthermore, SwRI has articulated a legitimate business justification for Khalek's directive in seeking to improve Wei's communication skills. *See, e.g., Roman v. Cornell Univ.*, 53 F. Supp. 2d 223, 237 (N.D.N.Y. 1999) (noting that a business justification may include "avoiding or lessening interpersonal conflicts, preventing non-foreign language speaking individuals from feeling left out of conversation, and preventing non-foreign language speaking individuals from feeling that they are being talked about in a language they do not understand"); *Long v. First Union Corp.*, 894 F. Supp. 933, 941 (E.D. Va. 1995) (finding a business justification where the employer sought to prevent employees from using the fluency in another language to isolate and intimidate members of other ethnic groups). Consequently, Khalek's directive to Wei cannot be viewed as evidence of discrimination.

**2.   Wei cannot show that any similarly-situated employee was treated more favorably.**

Similarly, Wei's claims fail because he cannot establish that he was replaced by someone outside of his protected class or that similarly situated employees were treated more favorably. First, it is undisputed that Wei was not replaced by another Principal Engineer. Exhibit Z, Department of Emissions R & D Organizational Chart. Second, Wei has not identified a similarly situated employee who received preferential treatment. The Fifth Circuit defines the phrase "similarly situated" very narrowly. *Ochoa v. BP Am., Inc.*, No. H-09-122-6, 2011 U.S. Dist. LEXIS 33110, at *17 (S.D. Tex. Mar. 29, 2011); *Silva v. Chertoff*, 512 F. Supp. 2d 792, 803 n.33 (W.D. Tex. 2007). For example, similarly situated individuals must have the same

supervisor, same job or responsibilities, same person making employment status decisions, essentially comparable histories, and "critically, the plaintiff's conduct that drew the adverse employment decision must have been '***nearly identical***' to that of the proffered comparator who allegedly drew dissimilar employment decisions." *Player v. Kan. City S. Ry. Co.,* 496 F. App'x 479, 481-82 (5th Cir. 2012) (emphasis added); *see also Martin v. Budget Rent-A-Car Sys. Inc.,* 432 F. App'x. 407, 410 (5th Cir. 2011) (same); *Beltran v. Univ. of Tex. Health Sci. Ctr. at Houston,* 837 F. Supp. 2d 635, 642 (S.D. Tex. 2011) (holding that the "nearly identical" standard is a stringent one and excludes employees with "different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records").

Here, Wei cannot point to any such comparator. As he admitted, Wei was, in fact, the only Principal Engineer supervised by Khalek. Exhibit D, Deposition of Qiang Wei, p. 122. Furthermore, there is no evidence that Wei actually suffered any job detriment because of any refusal to follow Khalek's directive so there, necessarily, can be no evidence of more favorable treatment towards any other employee. Consequently, because Wei has failed to and, indeed, *cannot* prove a prima facie case of race or national origin discrimination, summary judgment for SwRI is proper.

**3.    SwRI has put forth a legitimate non-discriminatory reason for its actions.**

Assuming arguendo that Wei could somehow establish a prima facie case of discrimination, SwRI has a legitimate, non-discriminatory reason for Wei's termination. In his termination recommendation, Khalek noted that Wei's "poor verbal communications skills have held him back in engaging with other technical and professional staff members" and that Wei had received the lowest score in oral presentations at a recent conference. Exhibit U, Khalek Termination Recommendation. Further, Khalek pointed to the IR proposal as an example of

Wei's poor written communication skills.  Exhibit U, Khalek Termination Recommendation. Most importantly, Wei's performance since receiving the NI rating on his evaluation had gone "downhill," and instead of seeking to improve his performance, Wei began seeking daily work instructions and debating with Khalek over work assignments.  Exhibit C, Deposition of Imad Abdul-Khalek, p. 113;  Exhibit U, Khalek Termination Recommendation.  In the course of his work, Wei also contributed to damaging two expensive particle instruments.  Exhibit U, Khalek Termination Recommendation.   Consequently, SwRI concluded that Wei's inability or unwillingness to perform the work for which he was hired required his immediate termination. Exhibit Y, Termination Letter.

### 4.    Wei cannot establish that SwRI's non-discriminatory reason is a pretext for discrimination.

Since SwRI has articulated its legitimate reason, the burden shifts to Wei to prove discriminatory pretext.  "To establish pretext, [a plaintiff] must show that [a defendant's] proffered explanation is false or unworthy of credence." *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011).  In other words, he must show that intentional discrimination lay at the heart of SwRI's decision.  *See Price v. Fed. Express Corp.,* 283 F.3d 715, 720 (5th Cir. 2002). This is a "heavy" burden that cannot be met solely by conclusory statements, opinions, or subjective beliefs.  *Little v. Republic Ref. Co.*, 924 F.2d 93, 96 (5th Cir. 1991); *see also Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 313 (5th Cir. 1999) (holding that a subjective belief that the employer's actions were based on race was insufficient to create an inference of discriminatory intent).  Wei cannot meet this heavy burden.

As discussed above, SwRI's PARC Committee collectively decided to terminate Wei's employment.  It is well-settled that "a collective decision-making process negates an inference of discrimination." *Strong v. Univ. Health Care Sys., LLC,* 482 F. 3d 802, 806 n.2 (5th Cir. 2007);

*Jefferson v. Hosp. Partners of Am., Inc.,* No. H-08-1535, 2009 U.S. Dist. LEXIS 126611, at *57 (S.D. Tex. May 18, 2009).  Even more, Wei has no actual evidence that any of the decision makers were acting with racially discriminatory animus when they made this discharge decision.

Further, Wei's disagreement with how SwRI characterized his job performance is not evidence of discrimination.  *See LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007) (refusing to question employer's decision to terminate employee for performance issues when employee disputed the underlying facts leading to decision); *Lewis-Sterling v. CHRISTUS Homecare*, No. 4:08-2335, 2009 U.S. Dist. LEXIS 88295, at *31 (S.D. Tex. Sept. 25, 2009) (noting that the "plaintiff's disagreement with the reasons for the employer's decision is insufficient to create an issue of pretext").  Moreover, the duty of this Court when "conducting a pretext analysis is not to engage in second-guessing of an employer's business decisions." *LeMaire*, 480 F.3d at 391.  Nor does Title VII "protect against unfair employment decisions . . . An employer can make an incorrect employment decision; if based on a good faith belief with no discrimination influences, then the court will not try the validity of the reason." *Jones v. Overnite Transp. Co.*, 212 F. App'x 268, 275 (5th Cir. 2006).

Ultimately, it is pure speculation by Wei that because he is Chinese and was discharged he must be the victim of discrimination.  However, as noted above, subjective beliefs are not competent evidence and are therefore insufficient to defeat summary judgment.  *See, e.g., Septimus v. Univ. of Houston*, 399 F.3d 601, 610 (5th Cir. 2005) (holding that a plaintiff's belief of discrimination "however genuinely held, is not sufficient evidence of pretext"); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000) (holding that the plaintiff's subjective belief was insufficient to establish pretext).

Finally, the fact that Wei's supervisor "highly recommended" hiring Wei in the first place undercuts any notion that Wei was discriminated against by the *very same* supervisor once he was employed.   In *Brown v. CSC Logic*, 82 F.3d 651, 658 (5th Cir. 1996), the Fifth Circuit recognized that when the same supervisory employee hires and fires a plaintiff within a short period of time "a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Id.* at 658.   There, the same actor inference was applied when an employee's hiring and termination were separated by four (4) years, whereas here, the difference is a mere eight (8) months.   *See id.*   To paraphrase another court that has applied *Brown's* rationale, it is "highly unusual and illogical" that at the same time that Khalek was encouraging Wei to apply and highly recommending that Wei be hired he was already in the process of devising a plan for Wei's termination simply because of his race or national origin. *See Nazarov v. La. State Univ.*, No. 08-3978, 2010 U.S. Dist. LEXIS 45457, at *19 (E.D. La. May 7, 2010).   As such, summary judgment for SwRI on Wei's race and national origin discrimination claims is proper.

**B.      Wei cannot establish a prima facie case of retaliation.**

To establish a prima facie case of retaliation, a plaintiff must show that (1) he participated in an activity protected by Title VII; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action. *Manaway v. Med. Ctr. of Se. Tex.*, 430 F. App'x 317, 324 (5th Cir. 2011); *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007).   To satisfy the causation requirement of the third prong, Wei must "provide sufficient evidence to allow a reasonable juror to conclude that [his protected activity] was the 'but-for' cause of [his] termination." *See Finnie v. Lee Cnty., Miss.*, Nos. 12-60623, 12-60686, 2013 U.S. App. LEXIS 18950, at *7 (5th Cir.

Sep. 13, 2013). In other words, the "desire to retaliate [must be] the *but-for* cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 113 S. Ct. 2517, 2528 (2013) (emphasis added). Only if Wei is able to establish a prima facie case does the burden shift to SwRI to proffer a legitimate, nonretaliatory reason for its actions. *See McCoy*, 492 F.3d at 557. Once SwRI articulates its reason, Wei bears the ultimate burden of proving that SwRI's proffered reason is not true but instead is a pretext for the real retaliatory purpose. *See McCoy*, 492 F.3d at 557; *Manaway*, 430 F. App'x. at 324-325. He cannot meet this burden.

### 1.    Wei did not engage in protected activity.

Wei's alleged complaints about Khalek's directive regarding speaking Chinese are not "protected activity" under Title VII. To support an actionable retaliation claim under Title VII, a plaintiff must have "opposed any practice made an unlawful employment practice by this subchapter," or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Wei did neither. It is undisputed that Wei was terminated before he filed a charge of discrimination. Furthermore, Wei's alleged complaints do not implicate an unlawful employment practice.

Under SwRI's Equal Employment Opportunity Policy, an employee who feels that his or her manager has not resolved a complaint may bring the matter to the attention of SwRI's Equal Employment Opportunity Office (the "EEOO"). Exhibit AA, Equal Employment Opportunity Policy. Further, under the Policy, all managers are to notify the Human Resources Department or the EEOO of "any discrimination or harassment complaint . . . as soon as possible." Exhibit AA, Equal Employment Opportunity Policy. Despite signing an acknowledgement of his receipt of this Policy, Wei claims to have not been aware of its provisions. Exhibit D, Deposition of Qiang Wei, pp. 195-96. Instead, Wei admits that the first time he contacted HR to

discuss his concerns regarding Khalek's treatment of him was on August 18, 2011. Exhibit D, Deposition of Qiang Wei, p. 196. Even then, Wei did not mention Khalek's directive regarding speaking Chinese. Exhibit V, Email from Wei dated August 18, 2011.

Critically, Wei's complaints to Khalek, White, and others were not based on any discrimination; rather, Wei complained about the unfair expectations that Khalek had for him. Indeed, when he reached out to HR after being given his annual evaluation, Wei did not mention Khalek's Chinese language directive at all. Instead, he claimed that standards that Khalek set for him were too high and not in line with those expected by other supervisors at SwRI. Exhibit Q, Email from Angell dated August 4, 2011. Wei offered no support for this proposition and did not name even one other supervisor who had more lenient standards, however. And in his own comments to his annual performance evaluation, Wei did not mention that he believed the Chinese language directive to be discriminatory. In fact, Wei did not mention this directive at all. Exhibit N, August 2011 Performance Evaluation Summary.

As such, these complaints do not warrant judicial protection. *See, e.g., Turner v. Baylor Richardson Med. Ctr.*, 476 F. 3d 337, 349 (5th Cir. 2007) (concluding that the plaintiff's email regarding the deteriorating relationship between him and his coworkers did not give rise to protected activity); *Harris-Childs v. Medco Health Solutions, Inc.*, 169 F. App'x 913, 916 (5th Cir. 2006) (holding that plaintiff did not engage in protected activity when she never "mentioned that she felt she was being treated unfairly due to her race or sex"); *Wright v. Custom Ecology, Inc.*, No. 3:11-CV-760, 2013 U.S. Dist. LEXIS 56433 at *24 (S.D. Miss. Apr. 19, 2013) (observing that the plaintiff did not engage in any protected activity because his complaints did not reference any discrimination). Because Wei does not base his retaliation claim on any protected activity, he cannot establish a prima facie case and summary judgment is proper.

2.  **Wei cannot establish a causal connection between any alleged protected activity and his termination.**

Even if Wei could establish that he engaged in protected activity, which he cannot, there is no causal connection between that activity and his termination.  In order to establish a causal connection between Wei's alleged complaint to Khalek and his subsequent termination, Wei must establish that the decision maker had knowledge of his complaint.  *See Anthony v. Donahoe*, 460 F. App'x 399, 405 (5th Cir. 2012) (holding that an EEOC complaint was not the but for cause of employee's reassignment because supervisor had no knowledge of it); *Reynolds-Diot v. Grp. 1 Software, Inc.*, 3:03-CV-0245-M, 2005 U.S. Dist. LEXIS 17102, at *11-12 (N.D. Tex. Aug. 17, 2005) (granting the defendant's motion for summary judgment when supervisor terminating the plaintiff had no knowledge of her sexual harassment complaint).  Because Wei has not provided any evidence that the PARC Committee had knowledge of any alleged complaint of an unlawful employment practice, SwRI could not have retaliated against him for that complaint.  *See Anthony*, 460 F. App'x at 405; *see also Bryan v. Chertoff*, 217 F. App'x 289, 293 (5th Cir. 2007) (finding no retaliatory nexus found where there was no knowledge of the employment discrimination complaints); *Holmes v. Drug Enforcement Admin.*, 512 F. Supp. 2d 826, 850 (W.D. Tex. 2007) (finding that a transfer was not related to employment discrimination claim because nothing indicated the board's knowledge of the complaints).

Moreover, even though the timing between Wei's alleged complaint to Khalek and his termination was relatively short, "temporal proximity alone is insufficient to prove but for causation" *See Strong v. Univ. Healthcare Sys., LLC*, 482 F.3d 802, 808 (5th Cir. 2007); *see also Mumfrey v. CVS Pharmacy, Inc.*, 719 F.3d 392, 406 (5th Cir. 2013) (holding that proximity evidence, without other persuasive evidence of pretext, is insufficient to demonstrate retaliation); *Roberson v. Alltel Information Services*, 373 F.3d 647, 656 (5th Cir. 2004) (holding that

"[w]ithout more than timing allegations . . . summary judgment in favor of [the defendant] was proper").

Finally, to the extent Wei claims that his August 18, 2011 email to HR titled "Is this a health work environment?" was protected activity, he never mentioned any complaint of discrimination in the email and the recommendation to terminate his employment had already been made two days earlier on August 16, 2011.  *See, e.g.*, *Clark County School Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (holding that discipline contemplated prior to an employee's discrimination complaint, but not carried out until afterward, is "no evidence of causality"); *Strong*, 482 F.3d at 808 (holding that plaintiff's evidence of retaliation was not compelling in light of her disciplinary record prior to her complaint).  Because Wei cannot establish a prima facie case of retaliation, summary judgment for SwRI is proper.

      **3.**     **Wei cannot establish retaliatory pretext.**

Even putting aside all of the above deficiencies and further assuming Wei could establish a prima facie case, summary judgment is still proper because he cannot establish pretext.  Wei was discharged because his job performance deteriorated significantly following his annual evaluation to an extent that it demonstrated to SwRI a refusal to perform the tasks assigned to him.  Wei has presented no evidence that SwRI's stated rationale for Wei's termination is a pretext for retaliation.  Since Wei cannot establish he would not have been discharged "but for" some protected activity, summary judgment is proper on Wei's retaliation claim.

WHEREFORE, Defendant Southwest Research Institute respectfully requests that this Court grant this Motion for Summary Judgment and for such other and further relief, including attorneys' fees and costs incurred in this case, to which it may be entitled.

Respectfully submitted,

FULBRIGHT & JAWORSKI LLP


By: /s/ Mario A. Barrera
    Mario A. Barrera
    State Bar No. 01805915
    Stephen J. Romero
    State Bar No. 24046756
300 Convent Street, Suite 2100
San Antonio, Texas 78205
Telephone: (210) 224-5575
Telecopier: (210) 270-7205

Attorneys for Defendant
Southwest Research Institute


## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of September, 2013, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Edith K. Thomas
777 Main Street, Suite 600
Fort Worth, TX 76102

Glenn D. Mangum
Law Offices of Glenn Mangum
924 Camaron
San Antonio, Texas 78212


                /s/ Mario A. Barrera
                Mario A. Barrera