FILED

OCT 17 2013

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY ———————— DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

QIANG WEI                                       )
                                                )    Civil Action No. 5:12-CV-00872
                      Plaintiff                 )
                                                )
                v.                              )
                                                )
SOUTHWEST RESEARCH INSTITUTE                    )
                                                )
                      Defendant                 )
                                                )

## RESPONSE IN OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE BIERY

Now Comes Plaintiff, Dr. Qiang Wei, and files this his response in opposition to

Defendant Southwest Research Institute's Motion for Summary Judgment.  Summary judgment

is improper because the record contains multiple disputed issues of material facts underlying all

Plaintiff Qiang Wei's claims as stated in his complaint. Defendant's motion should be denied so

that the jury, as the finder of fact, can evaluate the merits of Plaintiff's claims and any defenses

based on a full record at trial. In support of his response, Plaintiff respectfully shows as follows:

## I.       INTRODUCTION

In August of 2011, Southwest Research Institute ("Institute" or "SwRI" or "Defendant")

terminated Dr. Qiang Wei in violation of Title VII of the Civil Rights Act of 1964, as

amended, 42U. S. C. Section 2000e et seq. ("Title VII") and the Texas Commission on

1

Human Rights Act, Tex. Labor Code Ann. § 21.001 et seq. (West)("TCHRA"), and in violation of 42 U.S.C.A. § 1981 (West) ("section 1981"). The Institute terminated Dr. Wei based on his race and national origin, and in retaliation for engaging in protected activity under Title VII, TCHRA, and 42 U.S.C.A. § 1981. The evidence in this case is both direct and circumstantial, and there are numerous disputed facts surrounding his termination that should be determined by a jury.

## II.    SUMMARY JUDGMENT

Although summary judgment is proper in a case where there is no genuine issue of material fact, this case does not meet that standard. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Fed. R. Civ. P. 56(c). A moving party cannot obtain summary judgment with a mere conclusory assertion that the plaintiff has no evidence to prove his case. Quite the contrary, a moving party must discharge the burden Federal Fed. R. Civ. P. 56 places upon it; that is, it must demonstrate, through competent evidence, that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Celotex Corp., 477 U.S. at 328(White, J., concurring); Fed. R. Civ. P. 56(c). Regardless of which party bears the burden of proof on an issue at trial, the party moving for summary judgment always bears an initial burden of showing that summary judgment is proper. If the non-movant presents evidence that creates a genuine issue of material fact, summary judgment may not be granted. Fed. R. Civ. P. 56(c).

### A.  **Defendant's Burden Under the Federal Rules of Civil Procedure**

Under Federal Rule of Civil Procedure No. 56, summary judgment must be construed, in part, "with due regard for the rights of persons asserting claims adequately based in fact to have

those claims and defenses tried to a jury. . . ." <u>Celotex Corp.</u>, 477 U.S., 327. The Fifth Circuit has cautioned that, because "summary judgment is a potent weapon," "courts must be mindful of its aims and targets and beware of overkill in its use." <u>Findeisen v. N. E. Indep. Sch. Dist.</u>, 749 F.2d 234, 239 (5th Cir. 1984). Courts should therefore be particular circumspect where, as in this case, the case is scheduled for jury trial.[1] <u>Id.</u>

### III.    FACTS

*i.      Dr. Qiang Wei's personal and professional background.*

Dr. Wei first arrived in the United States from China in the late 1990s as a mechanical engineering student at the University of Minnesota seeking entry into the American dream. He worked very hard, earning an M.S. in 1999 and his PhD in mechanical engineering in 2002, both from the University of Minnesota. Wei Depo. 34:1 – 17, Attachment F. . Naturally, all of his coursework was completed in English. (<u>Id.</u>) Dr. Wei's faculty advisor was a world-renowned expert in mechanical engineering – Dr. David B. Kittleson. Wei Depo. 34:18 – 20, Attachment F. Dr. Wei's overall GPA was 3.716 out of 4. Wei Declaration, paragraph 5, Attachment G. Prior to coming to the US in 1996, Dr. Wei lived in China and earned a Bachelor of Science from Hunan University in Hunan, China in 1989. Wei Declaration, paragraph 3, 6, Attachment G.

At the time he came to the United States, Dr. Wei was 27 years old. Wei Declaration, paragraph 6, Attachment G. . He had lived his entire life prior to that time in China, but came to the United States like so many immigrants for more opportunities. Before his termination by the Institute, Dr. Wei had no intention of ever leaving the United States. Wei Declaration, paragraph

---

1 Plaintiff has requested a jury trial which according to the Court's scheduling order will be set after a summary judgment decision is issued.

6, Attachment G. . In fact, his wife and children are United States citizens. Wei Declaration, paragraph 6, Attachment G. .

Although not a native English speaker, Dr. Wei has studied English for 35 years. He has over 40 publications in English, and has made numerous presentations in English. Wei Declaration, paragraph 5, Attachment G.

> ii. *The Institute chooses Dr. Qiang Wei because of his superior qualifications for an open research position.*

In 2010, Dr. Wei applied for and completed a rigorous application and interview process for an open position at the Institute, which included interviews with Institute employees Erin Rogers (human resources), Jeff White, Christopher Sharp, Martin Heimrich, Vlad Ulmet, and Bruce Bykowski. Khalek Depo. 16:11- 20:17, Exhibit 37, Attachment. H.. Additionally, as part of the hiring process, Dr. Wei made 20 minute presentation in front of several of the individuals who interviewed him. Khalek Depo. 21:23- 22:19, Attachment H.  Dr. Khalek – who would become his immediate supervisor – strongly recommended Dr. Wei for the position. Khalek Depo. 21:12- 21:18, Attachment H.  After successfully completing the hiring process, the Institute extended an offer to Dr. Wei to become a Principal Engineer. Wei Depo. 152:8-152:22, Exhibit 8, Attachment G.  Dr. Wei accepted the position at Southwest Research Institute and left behind a 6 year track record with Horriba. Id.  Moving his entire family, including his two children and his wife, was a big commitment that he made for Southwest Research Institute. Wei Declaration, paragraph 7, Attachment F.

4

The open position[2] was for researcher in one of the Institutes 11 technical divisions, specifically the Engine, Omissions and Vehicle Research Division ("Division over 3") which conducts design, development, and test programs for components, engines, transmissions, and vehicles. Dr. Imad Khalek[3] was a Program Manager in the Department at the time of Dr. Wei's employment at the Institute. Directly above Dr. Khalek was Jeff White, who served as the Department's Director for the Omissions R&D Department, and the Vice President of Division 3 was Bruce Bykowski.

Prior to moving to San Antonio to accept a position at the Institute, Dr. Wei worked for Horriba in Michigan, where he worked for approximately 6 years. Wei Depo. 33:6, Attachment F. He enjoyed his job, but as he was always ambitious, he kept an eye out for an opportunity that would allow him to further his career. When he heard there was an opening and Southwest Research Institute, Dr. Wei interviewed for the position and, although he was given a different title, took over directly for a departing employee (Tom Bougher). White Depo. Vol. 1, 61:1-11,Attachment D Exhibit 7 to Wei Depo.

iii.    *Dr. Wei's social connections with fellow Chinese native, Reggie Zhan.*

In the beginning, the Institute treated Dr. Wei well. He started to settle in, and found that close by worked another native Chinese speaker – Reggie Zhan. Dr. Wei and Zhan did not work

---

2 The position of Principal Engineer at the Institute is a "position [that] grows naturally from the Senior Research position…" Wei Depo. 161:8 – 9, Exhibit 11, Attachment H. The departing employee held the Senior Research title. Khalek Depo., 7:16-20, Attachment H.

3 Dr. Khalek and Dr. Wei had known each other socially at the University of Minnesota, and Khalek was the first to inform Dr. Wei of the opportunity at Southwest Research Institute. Defendant uses this fact to argue that at this stage, summary judgment should be granted based on the same actor inference. It would not be appropriate to grant summary judgment based on the same actor inference for several reasons, including that it is an evidentiary shorthand for a jury, the evidence of discrimination is overwhelming, and the same actor inference is wholly inapplicable to retaliation claims.

5

in the same department, and other than general advice or Zhan requesting assistance with Chinese clients, had no reason to discuss work-related issues. Zhan's office was so close to Dr. Wei's that any time Reggie Zhan took a trip to the kitchen he passed by Dr. Wei's office. Wei Decl., paragraph 12, Attachment G.

Zhan and Dr. Wei shared several social connections, for example, both of them played volleyball in the same league. Wei Decl., paragraph 13-14, Attachment G. Naturally, this became an occasional topic of conversation, and as individuals who spent their formative years in China, the conversations often took place in Chinese and in Dr. Wei's office. Wei Decl., paragraph 13-14, Attachment G. These conversations in Chinese were not in a break room, with other staff members present, and were certainly not taking place in meetings with non-Chinese speakers. Id.

 

       *iv.*     *Dr. Khalek's English – only directives.*

Dr. Khalek didn't like it the fact that Zhan and Dr. Wei spoke Chinese, even privately. White Depo. Vol. 1, Exh. 34 Attachment D. It angered him in fact, and not long after Dr. Wei's initial performance evaluation on or about June 24, 2011, Khalek began to tell Dr. Wei not to speak in Chinese at work at all. Wei Decl.., paragraph 11, Attachment F. Dr. Wei believed the directive to be discriminatory, but he had no idea that the "no Chinese rule" Dr. Khalek sought to impose would impact his performance rating at the time, and feared retaliation if he complained. Wei Decl.., paragraph 11, Attachment F

Dr. Khalek's first review of Dr. Wei was a "meets expectations" with several favorable comments, and Dr. Wei received praise for his work from clients and Dr. Khalek. Jeff White stated in his deposition that Dr. Wei's work was good, in fact. White Depo., Vol. 2, 5:8-11,

Attachment E. Yet Dr. Khalek's next review of Dr. Wei gave him an overall "needs improvement." The review specifically stated in the 3rd paragraph of the Opportunities to Improve Job Performance:

> Qiang is expected to speak English in the workplace and no other language when other staff members are present. For private conversations, or a foreign language is needed, Qiang can excuse himself to an isolated area and speak in foreign language.

Wei Depo. Exhibit 16

This was despite the fact that Dr. Wei never spoke Chinese outside of handful conversations he had with Reggie Zhan that centered primarily about volleyball, assisting Zhan with Chinese clients, and with Zhan assisting Dr. Wei with Institute procedures, almost all of which occurred in Dr. Wei's office. Wei Decl. paragraph 12-14, Attachment F. Khalek's statement regarding speaking Chinese was specifically included in the portion of Wei's review that is used to calculate an overall rating. The only problem Dr. Khalek identified in his deposition with Dr. Wei and Zhan's conversations was that Khalek didn't want to interrupt the conversation if he needed something from Dr. Wei. Khalek Depo., 38:16-40:14, Attachment H.

> v.   *The Institute instructs Dr. Wei how to dispute statements in his performance review, in Dr. Wei complains about English only directives.*

The day Dr. Khalek gave Dr. Wei his second review that negatively reviewed his performance based on the use of Chinese at work, August 4, 2011, Dr. Wei turned to human resources to find out the procedure to challenge the discriminatory review. Wei Depo.225:24-227:3, Exhibit 17, Attachment  F.  Dr. Wei was sure now that he was being discriminated against, and that his rating in his review was based on discriminatory factors. Wei Declaration, paragraph 18, Attachment G. He emailed Erin Angell in the Institute's Human Resources Department to ask how to challenge his review. Wei Depo.225:24-227:3, Exhibit 17, Attachment

7

F.   The answer he received was that he should meet with his supervisor to seek further clarification of his supervisor's expectations, and could make comments in the review itself. Wei Depo. Exhibit 17 Attachment F. She stated that each division had discretion to handle their performance evaluation processes. Id. SwRI policy also encouraged, if not required, complaints of discrimination to pass through the employee's immediate supervisory chain first. Crumlett Depo. 28:1-10, Attachment B. For Dr. Wei, his immediate supervisor was Dr. Khalek, and Dr. Khalek's supervisor was Jeff White in August of 2011.

This is exactly what Dr. Wei did –Dr. Wei felt like he was being discriminated against for speaking Chinese at work, so he approached Jeff White about his review and made rebuttal comments in his review which he stated he did not agree with paragraphs 2 or 3 of his review. White recalled in his deposition meeting Dr. Wei on August 4, 2011 individually and that Dr. Wei wanted to discuss the expectation as stated in his evaluation that he was expected to speak English in the workplace. White Deposition Vol. 1 49:2-8, Attachment D. When Dr. Wei approached Jeff White and complained about his review, Jeff White decided that he, Dr. Wei, and Dr. Khalek would sit down to discuss Dr. Wei's complaints that his performance review was unfair. White Deposition 49:2-8, Attachment D.  Jeff White[4], Imad Khalek, and Wei would all met to discuss Dr. Wei's review on August 5th 2011. White Deposition Vol. 1 50:9-24, Attachment D.

Jeff White did not stay for the duration of the meeting, and after he left the August 5, 2011 meeting, Dr. Khalek "clarified" his direction to Dr. Wei about speaking Chinese at work. After

---

4 White knew about the review prior to Dr. Wei's receiving it, and even asked Dr. Khalek about his comments regarding the use of Chinese. However, White never attempted to speak to Dr. Wei about Dr. Khalek discriminatory comments.

Dr. Wei complained that he didn't see how speaking Chinese impacted his performance, the following exchange took place. The following is a portion of the recorded conversation which was transcribed by a certified court reporter:

> Imad: … On the normal occasion I wanted to talk to you and I see some, you know some communication going on in − − in your own language, and I don't really want to be − −
> Wei:  We were in private.
> Imad: I don't really want to (inaudible).
> Wei:  We were in private.
> Imad: I might, actually (inaudible) to be open and in English. In private you can go home and talk to people.
> Wei:  (inaudible) Rick come to my office. I don't go to his office.
> Imad:  Speak English with him.
> Wei:   He want to speak Chinese.
> Imad: Don't speak Chinese with him.
>                    …
> Imad: This will affect your performance. Because one of the − one of the issues that's not mentioned here is that you also need to improve your verbal communication you need to work on your − your verbal communication.

White Depo. 98:1-99:25, Exhibit 34, Audio Recorder track 1, page 38:25 − 40:4]

> vi.     *Retaliation, harassment, and termination.*

Almost immediately after Dr. Wei's complaints to White and Khalek on August 4, 2011 and August 5, 2011 that he was being told not to speak his native language at work, i.e., discriminated against based on speaking Chinese at work[5], Dr. Khalek started to harass Dr. Wei in earnest. Dr. Khalek only waited approximately a week from the time of Dr. Wei's complaints to recommend Dr. Wei's termination based on false reasons. Dr. Wei complained in earnest to Dr. Khalek directly on August 5, 2011, and Dr. Khalek sent an email to Jeff White on August 11th, 2013 recommending Dr. Wei's termination.

> vii. *The Institute's reasons for terminating Dr. Wei change and evolve.*

---

9

Khalek drafted an initial memorandum recommending Dr. Wei's termination on August 12, 2011.  Several versions of this memorandum were circulated, and it was edited by both Jeff White and Human Resources employee Beverly Patterson. August 12, 2011 email chain, Attachment I.  In the initial memorandum drafted by Dr. Khalek, there was no mention of a specific piece of writing that was "poor" – and definitely no mention of an Internal Research proposal ("IR proposal"), but after a suggestion by Beverly Patterson that there should be example of Dr. Wei's "poor" writing, Jeff White came up with the IR proposal. Dr. Khalek stated in his deposition that in fact, the IR proposal was a good proposal, that Jeff White heavily edited proposals, and that a learning curve was to be expected. Khalek Depo. 149:24-151:24, Attachment H.  White routinely heavily edited written work product given to him by engineers, but Dr. Wei was the only one terminated – in fact, no one else was even disciplined.  Dr. Wei was not even given sufficient time to draft the proposal, and the proposal cited by Defendant's was a version that had already been edited by Dr. Khalek.  Many of White's edits were in fact to Dr. Khalek's written additions.

In one version of the draft memorandum, Khalek accused Dr. Wei of "contribut[ing] to the failure of two ($90,000) particle instruments." August 12, 2011 email chain, Attachment I. SwRI 1252].  There is no mention of the specifics of the damage allegedly caused by Dr. Wei, but the portion of the instrument(s) that needed to be repaired was essentially a small black, plastic fan. Khalek Depo. 59:4-7, Attachment G. Dr. Wei had nothing to do with any damage to one of the instruments, but the first broken fan occurred while Dr. Wei was cleaning the instrument. The actual cost of repair to the two particle instruments –combined-- was less than $300.  Khalek Depo. 59:8-11, Attachment G, Thomas Decl. Exhibit ___, SwRI 1039,1064].

Other employees in the same particle lab as Dr. Wei caused damage to equipment without being disciplined, and in his deposition, former Human Resources Director Bill Crumlett could not recall any other employees terminated for damage to equipment without some other related misconduct.

During the time period covering the review, from May 31 to July 31 2011, Dr. Wei received praise related to his work from his clients, colleagues, and Dr. Imad Khalek. Wei Declaration paragraph 10, Attachment G,  Khalek Depo. 69:2-7, Attachment H. In a customer survey conducted by the department in June 2011, the client rated the project which Dr. Wei was the leader/manager. The overall satisfaction given by the client was 'Good', which exceeded 'Average' according to the SwRI's rating method. Wei Declaration paragraph 10, Attachment H, White Depo. Vol. 1 47:01-25, Exhibit 33, Attachment  D. Perhaps more importantly, the client gave the project an "excellent" rating for the category entitled "effective communication." White Depo. Volume 1, 47:01-25, Attachment H.

Bykowski, White, Crumlett all identified a highly technical email trail between Dr. Qiang Wei and Dr. Khalek as an example of an attitude problem or unwillingness on the part of Dr. Wei to complete the particle research he was hired for, the email exchange with highly technical in nature.

After drafting of the termination memorandum by Jeff White and Imad Khalek, the memorandum was sent on to Bruce Bykowski. After meeting with human resources, the termination recommendation memorandum was edited again – and now included the following reference:

11

Imad's comments to Qiang regarding the use of the Chinese language were in reference to rudeness. Imad informed Qiang that it was rude to hold a private conversation in another language in the presence of others not speaking the language.

Qiang Depo., Exhibit 24, Attachment F

The Institute purposely included this edit because the human resources Department told Jeff White that the Chinese language issue needed to be addressed. White Depo., Volume 1, 90:22 – 91:17, Attachment D. Amazingly, no one from any department spoke to Dr. Wei to ask about the "Chinese language issue."

> vii.   *The Institute ignores and retaliates against Dr. Wei for complaining about Dr. Khalek's English-only rule.*

In the meantime, Dr. Wei was desperately trying to ascertain what Dr. Khalek expected of him. These attempts included directly sending Dr. Khalek an email on August 12, 2011 summarizing the instructions Dr. Khalek gave Dr. Wei on August 4, 2011 and August 5, 2011 – including that "… English is the only language that can be used on the SwRI's campus. Other languages aren't allowed even though the employees office door is closed." White Depo., Volume 1, 30:8-23, Attachment D, Crumlett Depo. 64:21 – 65:10, Attachment B.  White stated in his deposition that the August 12, 2011 email from Dr. Wei showed that Dr. Wei had "an attitude problem." White Depo., Volume 1, 30:8-23, Attachment D. Crumlett identified this email in his deposition – along with Dr. Wei's rebuttal comments in his evaluation – as instances that he knew about in which Dr. Wei questioned Dr. Khalek's statements the Dr. Wei needed to speak only English at work. Crumlett Depo. 64:21 – 65:10, Attachment B.[6]

---

6 Crumlett made numerous substantive changes to his deposition testimony, and Plaintiff intends to file a motion to strike those changes shortly with the court. However, for the most of the changes concerned testimony surrounding Exhibit 49, Crumlett's errata sheet did not alter the particular statements cited here.

Crumlett testified at length regarding Exhibit 49 in his deposition, but submitted substantive changes on an errata sheet along with his signature to the court reporter. Attachment B. Notably, at his deposition, Crumlett testified that the decision to terminate Dr. Wei was based on the email that reiterated Dr. Khalek's command that Dr. Wei was to use only English at the Institute even if Dr. Wei's office door was closed. Crumlett Depo. 66:07 – 16, 21 – 2567:12 – 15, 68:2 – 3, 68:10 – 12, Attachment B. Crumlett testified that Dr. Wei's August 12, 2011 email was not professional level conduct. Id. But no one even asked Dr. Wei what had happened or conducted any kind of investigation into Dr. Khalek's actions.

Meanwhile, Dr. Khalek retaliated against Dr. Wei, including giving him too much work to do and work far outside of his job description. So, on August 18, 2011, Dr. Wei sent an email to supervisors and human resources employees complaining of harassment, and asking for help. Even knowing about the "friction" caused by Khalek's English directives to Dr. Wei, no investigation was done into Dr. Wei's complaints.

   viii.   On August 22, 2011, the Institute terminates Dr. Wei.

On August 22, 2011, the Institute terminated Dr. Qiang Wei. He was notified of his termination by letter and during an in person meeting with Jeff White and Bruce Bykowski that day. Wei Depo. 72:16-22, 77:11-78:02, Exhibit 4, Attachment F. The letter stated that the reason for his termination was because of an inability or unwillingness to do the particle research for which he was hired. Wei Depo. 77:11-78:02, Exhibit 4, Attachment F. Dr. Wei recorded this meeting as well, and again complained that his boss – Dr. Khalek – told him that he could not speak Chinese at work and that doing so impacted his performance. As before, he was ignored, and no investigation was conducted.

13

## IV.    ARGUMENTS AND AUTHORITIES

### A.  *How the Court Must View the Summary Judgment Evidence*

In <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), the Supreme Court unanimously confirmed the standard courts must follow in ruling upon motions for summary judgment.[7]  *Reeves* and earlier Supreme Court precedent dictate that, in analyzing Defendant's motion, the Court *must* accept Wei's evidence as true and *must* draw all reasonable inferences in his favor.  <u>Reeves</u>, 530 U.S. at 150; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *see also* <u>Palasota v. Haggar Clothing Co.</u>, 342 F.3d 569, 574 (5th Cir. 2003).  Conversely, the Court <u>must</u> <u>not</u> weight the evidence or make credibility determinations, but leave these functions for the jury.  Juries play "a paramount role in [employment discrimination] cases." <u>Fierros v. Texas Dep't of Health</u>, 274 F.3d 187, 190-91 (5th Cir. 2001)(overturned on other grounds).  In evaluating summary judgment evidence, courts must refrain from the making of '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," which "are jury functions, not those of a judge."[8]  <u>Id.</u>(quoting <u>Reeves</u>, 530 U.S. at 150) (quoting <u>Anderson</u>, 477 U.S. at 255)); *see also* <u>Palasota</u>, 342 F.3d at 574; <u>Dibidale of Louisiana, Inc. v. Am. Bank & Trust Co., New Orleans</u>, 916 F.2d 300, 307-08 (5th Cir. 1990) <u>opinion amended and reinstated on reh'g</u>, 941 F.2d 308 (5th Cir. 1991).

---

7 *Reeves* states, "the standard of granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" <u>Reeves</u>, 530 U.S., 150(quoting <u>Anderson</u>, 477 U.S. at 250-251).

8 The fact that it appears that the nonmover is unlikely to prevail at trial or that the mover's facts appear more plausible are not reasons to grant summary judgment." <u>Jones v. W. Geophysical Co. of Am.</u>, 669 F.2d 280, 284 (5th Cir. 1982)(internal citations omitted).

14

Further, while the Court must review the entire record as a whole, *Reeves* specifically instructs the Court to "disregard all evidence favorable to [Defendant] that the jury is not required to believe," which may include evidence favorable to Defendant from interested witnesses such as managers or employees of Defendant. *Reeves* states:

> Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.  That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and impeached, at least to the extent that the evidence comes from disinterested witnesses.

Reeves, 530 U.S. at 151(emphasis added).  Employing this guidance, the Court may consider only (1) the evidence favoring Plaintiff and (2) whatever evidence there may be supporting Defendant's motion that is both *uncontradicted* and given by *disinterested* witnesses. *See* Id.

The *Reeves* discussion quoted above applies to summary judgment proceedings, and has been squarely adopted by the Fifth Circuit. *See* Blow v. City of San Antonio, Tex., 236 F.3d 293, 296 (5th Cir. 2001); Evans v. City of Bishop, 238 F.3d 586, 591 (5th Cir. 2000); Medina v. Ramsey Steel Co., Inc., 238 F.3d 674 (5th Cir. 2001).  Along with *Desert Palace*, the Supreme Court's unanimous decision in Reeves, 530 U.S. 133 makes summary judgment difficult to obtain in employment discrimination cases, especially where the employee's evidence casts doubt on the employer's supposedly lawful reason.  Reeves, 530 U.S. 133.  In Reeves, 530 U.S. 133, the Supreme Court ruled plaintiff's establishment of a *prima facie* case combined with doubt cast on the employer's proffered supposed non-discriminatory explanation for the employment decision are sufficient to support liability.  Id. at 148.  The Fifth Circuit has

recognized the *Reeves* holding. <u>Palasota</u>, 342 F.3d at 575, 576; <u>Blow</u>, 236 F.3d at 298; <u>Evans</u>, 238 F.3d at 591; <u>Medina</u>, 238 F.3d 674.

Dr. Wei easily meets his *prima facie* burden as he was both replaced by someone outside his protected class (Chinese), then defendant has failed to show that it's proffered reasons for termination are not pretext for discrimination. In Defendant' motion for summary judgment, Defendant lists a slew of allegedly nondiscriminatory reasons for Dr. Wei's termination. These are: 1) uncooperative behavior, and a refusal to perform tasks; 2) poor verbal communication skills; 3) a low score and an oral presentation at a recent conference; 4) IR proposal and that was allegedly poorly written; 5) performance that went downhill; 6) requests for daily instructions; 7) damaged to two particle instruments. D.'s MSJ,p.12. The only reasons listed in Dr. Wei's termination letter word that he was unwilling or unable to perform the work he was hired for. Dr. Khalek testified in his deposition that Dr. Wei was neither unwilling, nor unable to do his job. Khalek Depo. 123:12-14, page 133:13-22, Attachment G.

Although Khalek praised Dr. Wei in both performance evaluations for completing invention disclosures, his recommendation to terminated cited the time Dr. Wei spent on the disclosures as poor performance. In addition, Dr. Khalek changed positions completely in terms of Dr. Wei's initial performance – Dr. Wei received a meets expectations on his first review, but Dr. Khalek tried to rewrite history by stating that Dr. Wei did not perform up to expectations.

**B. The Fifth Circuit Clarified the Evidentiary Analysis in Rachid**

The Fifth Circuit clarified the evidentiary analysis at summary judgment in discrimination cases in <u>Rachid v. Jack In The Box, Inc.</u>, 376 F.3d 305, 311 (5th Cir. 2004).

16

Under the "modified" McDonnell Douglas framework outlined in <u>Rachid</u>, 376 F.3d 305,

plaintiffs claiming discrimination must:

(1)   demonstrate a prima facie case of discrimination;
(2)   the defendant then must articulate a sufficiently clear legitimate, non-discriminatory reason for its decision to terminate the plaintiff;  and
(3)   if the defendant meets its burden of production, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either:

     a.   that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative);

- or -

     b.   that the defendant's reason, while true, is only one of the reasons for its conduct, and that another "motivating factor" is the plaintiff's protected characteristic (mixed motives alternative).

<u>Id.</u> at 312.  Once a plaintiff demonstrates that a protected characteristic was a motivating factor

in the employment decision, the defendant then must prove that it would have made the same

employment decision regardless of its discriminatory animus.  <u>Id.</u>  A plaintiff prevails if the

employer fails in its proof of this last step. <u>Id.</u>

The modified-McDonnell Douglas approach is the proper framework for analyzing  sex,

race, and national origin discrimination claims.   See <u>Houda v. Jupiter Chevrolet</u>, CIVA

3:05CV1418D, 2006 WL 3531286, *4 (N.D. Tex. Dec. 7, 2006)(Fitzwater, J.)(noting that the

modified-McDonnell Douglas approach applies to Title VII and ADEA claims).  Similarly, the

Title VII standard of proof applies to TCHRA and 42 U.S.C.A. § 1981 claims.  <u>Shackelford v.</u>

<u>Deloitte & Touche, LLP</u>, 190 F.3d 398, 404 n.2 (5th Cir. 1999); <u>Martin v. El Nell Inc.</u>, 3:03-CV-

2209-D, 2005 WL 2148651, *2 (N.D. Tex. Sept. 7, 2005)(Fitzwater, J.).

### C. Multiple Genuine Issues of Material Fact Concerning Wei's Discrimination Claims Remain for the Jury to Decide

Title VII and the TCHRA make it unlawful for an employer to discharge any individual because of that person's race or national origin.  42 U.S.C.A. § 2000e(2) (West); Tex. Labor Code Ann. § 21.051 (West).  EEOC guidelines on national original discrimination under Title VII defines national origin discrimination as "discrimination based on national origin" broadly, to include acts of discrimination undertaken "because an individual has the physical, cultural or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1, and EEOC guidance on Title VII defines race discrimination as treating an employee unfavorably because he/she is of a certain race or because of personal characteristics associated with race.

Although 42 U.S.C.A. § 1981 is analyzed under the same evidentiary framework as VII U.S.C.A. § 1981 (West) race claims are to be very broadly construed as the Supreme Court has made clear:

> Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended 42 U.S.C.A. § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory.

Alvarado v. Shipley Donut Flour & Supply Co., Inc., 526 F. Supp. 2d 746 (S.D. Tex. 2007), citing Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 107 S. Ct. 2022, 95 L. Ed. 2d 582 (1987)

Wei may create triable fact issues concerning Defendants' violation of those provisions by adducing either direct or circumstantial evidence of discriminatory intent.  Desert Palace, Inc. v. Costa, 539 U.S. 90, 96, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003).  Even absent direct evidence, Wei may nevertheless create an inference of discrimination through circumstantial evidence of Defendant's discriminatory motives.  See Jackson v. Dallas Cnty. Juvenile Prob. Dep't, CIV.A. 3:06-CV-264MB, 2007 WL 2187250, *5-6 (N.D. Tex. July 30, 2007) aff'd sub

nom. Jackson v. Dallas Cnty. Juvenile Dep't, 288 F. App'x 909 (5th Cir. 2008)(examining circumstantial evidence in conducting a McDonnell Douglass review of the plaintiff's VII U.S.C.A. § 1981 claims).

A policy limiting the use of an employee's native language, or an English only rule, is discrimination under Title VII .see e.g. E.E.O.C. v. Premier Operator Servs., Inc., 113 F. Supp. 2d 1066 (N.D. Tex. 2000) Here, Dr. Khalek, Dr.Wei's immediate supervisor repeatedly told him that he should not speak Chinese.  These directives came in response to primarily social interactions between Reggie Zhan, another engineer, and Dr. Qiang Wei.  They applied only to Dr. Wei as an employee reporting to Dr. Khalek, and there were no other SwRI employees subject to this rule or restrictions – indeed, even Dr. Khalek himself used his native Arabic at work.  Dr. Khalek's performance rating of Dr. Wei stated that he should not use Chinese when other staff members were present, and it is undisputed that Dr. Wei complained that he believed the review to be unfair.

Defendant attempts to limit the circumstances, the English only rule applied to Dr. Wei. First, in doing so, they completely ignore testimony by their own former human resources director stated stated that he spoke specifically, to Jeff White about the English directives in Dr. Wei's review because it was possible violation of EEOC guidelines. Crumlett Depo. p. 56:9 – 23  Crumlett stated that an English only directive is prohibited by EEOC directives. Crumlett Depo. p. 46:20 – 47:3. Defendant also completely ignores the verbal conversation that took place between Dr. Wei and Dr. Khalek. In that conversation, Dr. Khalek told Dr. Wei not to speak Chinese at work and that "[he] could go home and talk to people." This directive was even in the context of Dr. Wei complaining about being told that he could not speak Chinese at work. A supervisor telling a

particular employee in a private meeting not to speak their native language is discriminatory English-only policy. <u>Penalver v. Res. Corp. of Am.</u>, 3:10-CV-0280-D, 2011 WL 1885988 (N.D. Tex. May 18, 2011)

This is a clear example of discrimination based on language/linguistic characteristics in violation of the EEOC guidelines. The guidelines even specifically subject any English only rules to high level of scrutiny. Defendant also tries to escape liability by stating that since Dr. Wei is "bilingual", and an English-only directives specifically to him would not be discriminatory. This argument is misplaced here, because there is no reason at all for the rule to have taken place, but for discrimination. Dr. Wei was treated very differently in terms of speaking his native language of work versus any other Institute employee, which is powerful evidence of discrimination.

### D. Wei's Prima Facie Case -- Wei's Evidence Easily Satisfies the "Low Showing" Necessary to Shift the Burden to Defendant

For Wei's claims to proceed to trial, he must first establish either direct evidence of discrimination or a prima facie case of discrimination. <u>Okoye v. Univ. of Texas Houston Health Sci. Ctr.</u>, 245 F.3d 507, 512 (5th Cir. 2001); <u>Jackson</u>, 2007 WL at , *6. At this stage, Wei simply needs to show that he (1) is a member of a protected class (e.g., Chinese); (2) was qualified for his position (Defendant does not dispute; (3) was subject to an adverse employment action (negative performance review and termination; and (4) was replaced by someone outside the protected class(es) (i.e., non-Chinese) or that he received less favorable treatment than a similarly situated individual not in the protected class(es). <u>Jackson</u>, 2007 WL at , *6(citing <u>Okoye</u>, 245 F.3d at 513).

His burden at this point is not onerous, <u>Bauer v. Albemarle Corp.</u>, 169 F.3d 962, 967 (5th Cir. 1999), and he need only make a "low showing" to shift the burden to Defendant.  See <u>Baker v. Am. Airlines, Inc.</u>, 430 F.3d 750, 754 (5th Cir. 2005).  It bears mention that this showing does not require proof of these elements; rather, Wei must show only that fact issues remain concerning the contested elements of his prima facie case.  See <u>Waltman v. Int'l Paper Co.</u>, 875 F.2d 468, 477 (5th Cir. 1989).  But once he makes this "low showing," an inference of discrimination arises that Defendants must rebut.  <u>Bauer</u>, 169 F.3d at 966.

Wei can meet each factor under this *prima facie* framework:

(1) Defendant does not dispute that Dr. Wei is a member of a protected class (e.g., Chinese);

(2) Defendant does not dispute that Dr. Wei was qualified for his position;

(3) Defendant does not dispute that Dr. Wei was subject to an adverse employment action –termination;

Dr. Wei was replaced by someone outside the protected class, (i.e., non-Chinese) or that he received less favorable treatment than a similarly situated individual not in the protected class(es).  The Institute hired Dr. Wei to conduct research in particle science. These duties existed prior to Dr. Wei becoming employee, and were taken over by Athanasios Mamakos, who is a Greek national, after Dr. Wei's departure. D.'s Responses to Interrogatories, Attachment I, White Depo., Volume 1, 8:6-25, Attachment D.  Dr. Wei's replacement has not ever complained of discrimination. <u>Id.</u> The Institute has used different titles for the individual who performs research in particle science under Dr. Imad Khalek's direction, but the general job duties have remained constant. D.'s Interrogatory Responses, Attachment I,  Draft of August 12, 2011 Mem

SwRI 1252, Attachment I. The department at the Institute that Dr. Wei worked did not disappear after Dr. Wei's termination, and during the time Dr. Wei worked there was headed by Dr. Imad Khalek and was still headed by Dr. Khalek after Dr. Wei's departure.

In addition, Dr. Wei was treated differently than any other Institute employee in important respects. No other Institute employee was 1) told not to speak his or her native language, and in fact, Dr. Khalek was known to speak Arabic at work:2) no other employee was terminated or disciplined based on writing skills, even if they needed extra assistance; and 3) other employees  who caused accidental damage to lab equipment were not disciplined or terminated.

### E.   Defendant's Proffered Reasons are Pretextual

As discussed more fully below, the temporal proximity in this case between the discriminatory acts and Dr. Wei's complaints are enough to rebut any proffered reason provided by Defendant as a "legitimate reason" for termination. Even so, the reasons put forth by Defendant are either demonstrably false or are subjective reasons that must be examined by a jury.

Defendant's statement that Dr. Wei's termination resulted from uncooperative behavior, and a refusal to perform tasks is subjective, and must be examined by a jury.  In fact, based on the totatlity of the evidence in this case, a jury could easily find that Dr. Wei was labeled "uncooperative" directly because of his complaints of discrimination.

SwRI states that it based Dr. Wei's termination in part on "poor verbal" skills. This too is disingenuous, for several reasons. SwRI required that Dr. Wei give a verbal presentation as part of the interview process, and even before Dr. Wei because an SwRI employee Dr. Khalek had

seen him present at conferences.  Not only that, in his deposition, Dr. Khalek stated that this was poor verbal communication skills was essentially a "non-factor" or a 2 out 100 in terms of importance to his recommendation to terminate Dr. Wei. Along with this, it is not credible that SwRI would terminate Dr. Wei based on a low score and an oral presentation at a recent conference.

In its Motion for Summary Judgment, Defendant cites an allegedly poorly writing IR proposal as a basis for the allegation that Dr. Wei's writing skills were poor.  This reason is also false. White routinely heavily edited written work product given to him by engineers, but Dr. Wei was the only one terminated – in fact, no one else was even disciplined.  Dr. Wei was not even given sufficient time to draft the proposal, and the proposal cited by Defendant's was a version that had already been edited by Dr. Khalek.

SwRI alleges that Dr. Wei's performance went downhill after receiving an NI rating, but this was also exactly when Dr. Wei complained of discrimination and was actively being discriminated against for speaking Chinese.  The period of time between when Dr. Khalek recommended Dr. Wei's termination and the date he was given the NI was approximately one week. This too is a subjective reason, which should be examined by a jury.

Finally, SwRI theorizes that Dr. Wei started requesting for daily instructions. The email chain that forms the basis of this characterization is highly technical, and None of the individuals evaluating the email trail had experience with the research discussed in the email trail, which centered around a discussion of a particle sizing instrument. In fact, although Crumlett identified an exchange discussing an "SMPS" as an example of Dr. Wei asking for instructions on "small

things", Crumlett had no idea what an SMPS was or did. Crumlett Depo., 72:2 – 14, Attachment B.

SwRI alleges that Dr. Wei damaged to two particle instruments, and that Dr. Wei's termination was based in part on this. D.'s MSJ,p.12. Dr. Wei mistakenly damaged an inexpensive part on one instrument, which was inexpensively and easily fixed. Not only that, there is no policy that calls for termination of an employee based on damage to an instrument and as discussed above, there were other employees in the same lab that damaged equipment but were not disciplined at all.

### F. "Same Actor" Inference is Not Dispositive, and "Same Group" Inference has Been Explicitly Rejected by Supreme Court in *Oncale*

#### i. *Same Actor Inference*

The Court should also reject Defendants' argument that Dr. Wei cannot overcome the inference of non-discrimination created by fact that the same individuals allegedly hired him and fired him.

As the Fifth Circuit stated in *Russell,* "the 'same actor' inference does 'not rule out the possibility that an individual could prove discrimination," Russell, 235 F.3d, 229, *quoting* Brown, 82 F.3d, 658; *see also* Haun, 81 F.3d, 546 (while same actor evidence is relevant, Court declined to establish categorical rule that no inference of discrimination could arise under such circumstances).  Especially at the summary judgment stage, the Court should refuse to draw the same actor inference if an employee has otherwise raised a fact issue, for "while the factfinder is permitted to draw this inference, it is by no means a mandatory one, and it may be weakened by other evidence." Buhrmaster v. Overnite Transp. Co., 61 F.3d 461, 464 (6th Cir. 1995).  After

discussing reasons why the inference may not apply in certain circumstances, the Seventh Circuit

noted:

> It is for these reasons that the same-actor inference is unlikely to be dispositive in very many cases. In fact, we have found no case in this or any other Circuit in which a plaintiff relying on circumstantial evidence to prove an improper motive was able to produce sufficient evidence to otherwise sustain his burden on summary judgment and yet was foreclosed from the possibility of relief by the same-actor inference. This is unsurprising given that the same-actor inference is not itself evidence of discrimination. It simply provides a convenient shorthand for cases in which a plaintiff is unable to present sufficient evidence of discrimination.

Johnson, 170 F.3d, 745, *citing* Rand, 42 F.3d, 1147; E.E.O.C., 77 F.3d, 152.

In this case, Wei has presented considerable direct evidence of and evidence of pretext

that is sufficient to overcome the same actor inference, and Defendants' Motion should be

denied. This shorthand is inapplicable in a case where there is such substantial other evidence,

and it wholly inapplicable in the context of retaliation.

## G. The full decision making process was based on discriminatory motivations.

In light of the Reeves, 530 U.S. 133 decision, courts in the Fifth Circuit have examined

workplace comments in two ways: under the "cat's paw" analysis and as direct evidence of

discrimination under the *Brown* framework. Brown, 82 F.3d, 655("remarks may serve as

sufficient evidence of age discrimination if the offered comments are: 1) age related; 2)

proximate in time to the terminations; 3) made by an individual with authority over the

employment decision at issue; and 4) related to the employment decision at issue. Comments that

are 'vague and remote in time' are insufficient to establish discrimination.) (citations

25

omitted).  Some courts have used the "cat's paw" analysis in determining whether remarks are sufficient to be evidence of discrimination.  *See, e.g.,* Laxton v. Gap Inc., 333 F.3d 572, 583 (5th Cir. 2003). To hold other decision-making parties responsible for the discriminatory statements or actions of another--to use the so-called "cat's paw" analysis--it must be shown that the discriminating individual influenced those making the ultimate decision. Russell, 235 F.3d, 226-27.

Here, there is no question that the recommendation to terminate Dr. Wei was based entirely on information that came directly from Dr. Khalek, and Defendant has not presented evidence otherwise that warrants summary judgment.

### H.  Wei can easily establish a *prima facie* case of retaliation .

To establish a claim of retaliation under Title VII, 42 U.S.C. § 2000 e- 3(a), and 42 U.S.C.A. § 1981, Plaintiff must demonstrate that: 1) he engaged in protected activity;2) an adverse employment activity occurred; and 3) the causal link exists between the protected activity and the adverse employment action. Richard v. Cingular Wireless LLC, 233 F. App'x 334, 336-7 (5th Cir. 2007)(quoting Fabela v. Socorro Indep. Sch. Dist., 329 F.3d 409, 414 (5th Cir. 2003). In cases where the plaintiff relies only on circumstantial evidence, the McDonnell Douglas burden shifting framework applies. The employee satisfies the three elements of the *prima facie* case of retaliation, the employer has the burden of production to date of judgment, nonretaliatory reason for the negative employment action. If the employer meet this burden of production, the employee is left the ultimate burden of proving that the adverse employment action would not have taken place before his engagement in the protected activity.

As stated above, Dr. Wei can easily meet his initial burden of make and *prima facie* case, and has shown that the proffered reasons for Dr. Wei's termination are pretextual. In addition, Dr. Wei has additional evidence that his termination was in retaliation for engaging in protected activity.

## A. Dr. Wei engaged in protected activity on several occasions prior to termination.

Plaintiff has the initial burden to show that he engaged in a protected activity to establish a prima facie case of retaliation. Brown v. City of Tucson, 336 F.3d 1181, 1186 (9th Cir. 2003)–87. Defendant argues that Plaintiff cannot show that Wei engaged in a protected activity because Wei's complaints do not implicate an unlawful employment practice. *D.'s Brief, p. 24.* It is well established that "[o]pposition to an unlawful employment practice constitutes protected activity." Finical v. Collections Unlimited, Inc., 65 F. Supp. 2d 1032, 1049 (D. Ariz. 1999)(quoting Moyo v. Gomez, 40 F.3d 982, 984 (9th Cir. 1994)); Pardi v. Kaiser Found. Hospitals, 389 F.3d 840, 850 (9th Cir. 2004)("pursuing one's rights under the ADA constitutes a protected activity."); Trent v. Valley Elec. Ass'n Inc., 41 F.3d 524, 526 (9th Cir. 1994)(quoting E.E.O.C. v. Crown Zellerbach Corp., 720 F.2d 1008, 1014 (9th Cir. 1983)("We have held that when an employee protests the actions of a supervisor such opposition is a 'protected activity.' ")). A plaintiff's opposition, however, must be based on a reasonable belief that the employer committed an unlawful employment practice. Moyo, 40 F.3d at 985. "The ADA forbids discrimination in employment on the basis of disability ... and forbids retaliation against those who oppose acts prohibited by the ADA." Stiefel v. Bechtel Corp., 624 F.3d 1240, 1242 (9th Cir. 2010)(citing 42 U.S.C.A. §§ 12112(a), 12203 (West)). The same framework applies to an ADA retaliation claim that applies to claims made under Title VII. Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1121 (9th

Cir. 2000) vacated sub nom. U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 122 S. Ct. 1516, 152 L. Ed. 2d 589 (2002). "The reasonableness of [a plaintiff's] belief that an unlawful employment practice occurred must be assessed according to an objective standard-one that makes due allowance, moreover, for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims." Moyo, 40 F.3d at 985. Even if a plaintiff's belief is mistaken, it is reasonable "if premised on a mistake made in good faith. A good-faith mistake may be one of fact or of law." Id. at 984(citing Jurado v. Eleven-Fifty Corp., 813 F.2d 1406, 1411 (9th Cir. 1987).

Dr. Wei repeatedly complained about the fact that his boss (Dr. Khalek) told him that speaking Chinese at work impacted his job performance. Dr. Wei complained about the English-only rule imposed upon him by Dr. Khalek on the following occasions:

- Dr. Wei complained in writing in his performance evaluation that he did not agree with Dr. Khalek's directives to him about speaking English;

- on August 4, 2011, Dr. Wei visited with Jeff White and complained about Dr. Khalek's English-only directives in his performance review;

- Dr. Wei again complained in the August 5, 2011 meeting that he believed reading his performance based on use of Chinese was unfair;

- Dr. Wei submitted an email that was circulated to decision-makers reiterating Dr. Khalek's English-only directives to him;

- Dr. Wei submitted a complaint of harassment via email. On August 18, 2011, that was never investigated;.

- On August 22, 2011 Dr. Wei point blank complained to Jeff white and perspicacity that he was not allowed to speak Chinese in his supervisor told him that if he spoke Chinese at work it negatively impacted his performance.

B. Temporal Proximity is sufficient to show a causal connection for purposes of retaliation.

A plaintiff alleging retaliation may satisfy the causal connection element by showing "[c]lose timing between an employee's protected activity and an adverse action against him." McCoy v. City of Shreveport, 492 F.3d 551, 562 (5th Cir. 2007). Such temporal proximity must generally be "very close." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001). This Court has found, for example, that "a time lapse of up to four months" may be sufficiently close, Evans v. City of Houston, 246 F.3d 344, 354 (5th Cir. 2001), while a five month lapse is not close enough without other evidence of retaliation, Raggs v. Mississippi Power & Light Co., 278 F.3d 463, 472 (5th Cir. 2002). Such evidence may include an employment record that does not support dismissal, or an employer's departure from typical policies and procedures. See Schroeder v. Greater New Orleans Fed. Credit Union, 664 F.3d 1016, 1024 (5th Cir. 2011).

There is no question that the temporal proximity to the time Dr. Wei received his review and complained is a matter of days, and is close enough to meet the temporal proximity test.

## V.    CONCLUSION

Because multiple genuine issues of material fact remain as to whether Defendant has unlawfully discriminated, and retaliated against plaintiff, the Court should deny summary judgment and allow this case to proceed to trial before a jury.

**Edith K. Thomas**
777 Main Street
Suite 400
Fort Worth, TX 76102
Telephone: (888)760-0149
Facsimile: (972)692-7988
Email: info@ediththomaslaw.com

By:    _/s/ *Edith K. Thomas*_____
*Edith K. Thomas*
SBN:24060717
Lead Attorney for Plaintiff

## CERTIFICATE OF SERVICE

    I hereby certify that on this 11th day of October, 2013, I electronically filed the foregoing instrument with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the counsel of record in this case for each party.

_____

Edith K. Thomas